**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:95-cr-53** |
| | ) | |
| **KEITH EUGENE GAFFNEY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MOTION FOR COMPASSIONATE RELEASE**
**PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) WITH MEMORANDUM OF LAW**

The United States, and the entire world, is grappling with an unprecedented pandemic. In the United States alone, there have been more than twenty six million confirmed cases and 460,000 deaths from COVID-19.[1] Older individuals and those with pre-existing medical conditions have been shown to have a higher rate of serious complications associated with COVID-19 infection.[2]

Mr. Gaffney[3] is a 66-year-old African American man. He has been in custody since he was 19 years old, nearly 50 years. While serving a District of Columbia sentence from 1973 at the now-shuttered Lorton Reformatory, Mr. Gaffney was convicted in this district and sentenced to life imprisonment for engaging in a criminal enterprise at Lorton. At the time of his federal conviction in 1995, the federal sentencing guidelines were mandatory, and this Court imposed the guideline-mandated life sentence. Mr. Gaffney, who has been incarcerated since 1973, is suffering from the mental and physical deterioration of aging in prison, a decades long hepatitis C infection,

---

[1] Centers for Disease Control and Prevention, Cases in the U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Feb. 8, 2021).

[2] Centers for Disease Control and Prevention, People at Increased Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited Feb. 8, 2021).

[3] Mr. Gaffney legally changed his name to "Khalid Abdul Mujahid" in 1996, and the BOP knows Mr. Gaffney by that name.

and a potentially life-threatening prostate condition. Despite recommendations that he be approved for transfer, he has been held at the USP Florence Administrative Maximum ("USP Florence ADX") since 1997.

Mr. Gaffney now respectfully moves this Court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). This motion should be granted because the global COVID-19 pandemic combined with Mr. Gaffney's age, hepatitis C and prostate condition are "extraordinary and compelling reasons" warranting compassionate release. The COVID-19 virus can lead to complications in people over 65, and people of all ages with chronic health conditions can be at risk of serious complications or death.[4] One of the only known mechanisms for preventing infection is social distancing, or maintaining a considerable distance from others while in public spaces.[5] This is simply not possible within the confines of a correctional institution.

Mr. Gaffney is susceptible to COVID-19 and is more likely to suffer dire consequences from the virus due to his age and medical conditions. Mr. Gaffney's incarceration at USP Florence ADX – located in a state with 377,856 cases of COVID-19, 20,769 people hospitalized from COVID-19, and 5,388 deaths due to COVID-19[6]– exposes him to a particularized risk of contracting the disease. Releasing Mr. Gaffney to home confinement to a family residence in Washington D.C. is the prudent and just response to the extraordinary and compelling circumstances created by the novel coronavirus.

---

[4] "People at Increased Risk for Severe Illness." Centers for Disease Control and Prevention, 3 December 2020, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited Jan. 20, 2021).

[5] "Social Distancing." Centers for Disease Control and Prevention, 15 July 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited Jan. 20, 2021).

[6] Colorado Department of Public Health & Environment, Colorado Covid-19 Data, https://covid19.colorado.gov/data (last visited January 20, 2021)

Mr. Gaffney's life sentence itself also warrants relief under § 3582(c)(1)(A). His sentence – to die in prison, where he has been confined since age 19 – was imposed under a now-unconstitutional sentencing regime and greatly exceeds what is sufficient but not greater than necessary based on the offenses that he committed. Mr. Gaffney has spent nearly 50 years incarcerated. He has been convicted of serious crimes but has had a clean disciplinary record within the BOP for more than a decade, despite being incarcerated since 1997 under the strictest and most onerous custodial conditions in the country at the Florence Supermax facility.

We respectfully ask that the Court grant compassionate release to Mr. Gaffney.

## FACTUAL BACKGROUND

Mr. Gaffney has been in continuous custody since 1973. That year, he was arrested and prosecuted in the District of Columbia Superior Court, where he was convicted after trial and sentenced to 24 years to life imprisonment.[7] While serving the D.C. sentence, Mr. Gaffney was prosecuted and convicted in 1995 in this district of continuing criminal enterprise, aiding and abetting assault with intent to commit robbery, aiding and abetting assault with a dangerous weapon, and possession of hydromorphone with intent to distribute. He was sentenced on September 27, 1995 – under the mandatory sentencing guideline regime – to life imprisonment. [8]

Mr. Gaffney has been incarcerated at USP Florence ADX since 1997. It appears that he was moved to Florence ADX due to the build-up of racial strife between Black and White inmates at USP Marion where Mr. Gaffney was designated after his trial and sentencing in this district.

---

[7] Mr. Gaffney's original D.C. sentence was modified in 1988 to 24 years to life imprisonment. His parole eligibility date was September 18, 2004. *See* PSR ¶¶ 56, 60, 63. *Id*. at ¶ 63.
[8] ECF DOC. 156 at 10; ECF DOC. 156 at 12. (Following an appeal to the Fourth Circuit, Mr. Gaffney was resentenced on November 19, 1996 for the same length of time).

Mr. Gaffney became a target of the Aryan Brotherhood, the notorious and violent white supremacist prison gang, and the group added his name to its hitlist.[9]

While incarcerated at USP Florence ADX, Mr. Gaffney has had a strong disciplinary record under the extremely difficult, if not inhumane conditions, of solitary confinement at the Supermax facility. *See* M. Binelli, *Inside America's Toughest Federal Prison*, N.Y. Times (Mar. 26, 2015). Indeed, it is almost impossible to overstate the draconian nature of the conditions under which Mr. Gaffney has had to live for more than 23 years. In the words of one former warden of USP Florence ADX, Robert Hood:

> "This place is not designed for humanity," he recalled. "When it's 23 hours a day in a room with a slit of a window where you can't even see the Rocky Mountains — let's be candid here. It's not designed for rehabilitation. Period. End of story."

*Id*. (quoting R. Hood, warden of USP Florence ADX from 2002 to 2005).

Despite all of this, Mr. Gaffney has not given up hope for his future. He has taken more than fifty courses over the past twenty-three years in an effort to rehabilitate himself, as set forth in the attached progress report. *See* Exhibit 2. He has maintained good behavior in BOP for more than a decade, and his progress report reflects no recent incident reports. *See id.* He has family members who continue to support him and provide a stable residence to which to return should this Court grant compassionate release.

---

[9] In 2002, members of the Aryan Brotherhood were prosecuted in the Central District of California under RICO for multiple murders and attempted murders of inmates, including 2 Black inmates from the District of Columbia. *See United States v. Mills et al.*, 2:02-CR-938 (C.D. Ca.). *See* S. Roberts, *Barry Mills, Brutal Leader of Racist Prison Gang, Dies at 70*, N.Y. Times (July 20, 2018), available at https://www.nytimes.com/2018/07/20/obituaries/barry-mills-brutal-leader-of-racist-prison-gang-dies-at-70.html. Mr. Gaffney (under the name Mujahid) was named in the *Mills* indictment as a target of the Aryan Brotherhood defendants.

Mr. Gaffney submitted a written request for compassionate release to the USP Florence ADX warden on November 18, 2020, which was subsequently denied.[10]  As set forth more fully below, he has satisfied the exhaustion requirement under 18 U.S.C. § 3582(c)(1)(A).

## ARGUMENT

### I.    The Court Has Jurisdiction to Grant Mr. Gaffney's Immediate Release

On December 21, 2018, the First Step Act became law.  Among the criminal justice reforms enacted in this landmark legislation, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow, for the first time, defendants to move for a reduction of sentence based upon extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*[.]"  First Step Act of 2018, § 603(b), Pub. L. 115- 391, 132 Stat. 5194, 5239 (Dec. 21, 2018).  By providing this alternate 30-day waiting period, Congress plainly sought to expedite judicial consideration of such motions and expedite defendants' access to the courts.  *See, e.g., United States v. Haney*, 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020).

Mr. Gaffney requested compassionate release from the Warden B. True on November 18, 2020.[11]  On December 3, 2020, Warden True denied Mr. Gaffney's request.[12]  Based on this information, this Court found that Mr. Gaffney "exhausted his administrative remedies."[13]

---

[10] ECF DOC. 182.

[11] ECF DOC. 179-2.

[12] ECF DOC. 179-3.

[13] ECF DOC. 182 (Order dated December 31, 2020).

Accordingly, Mr. Gaffney has satisfied the exhaustion requirement contained in 18 U.S.C. § 3582(c), and his motion is ripe for review.

## II. The Court Has Statutory Authority to Decide Whether "Extraordinary and Compelling Reasons" Exist

This Court has the authority to order Mr. Gaffney's immediate release. Section 3582(c)(1)(A)(i) states in relevant part that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"

When originally enacting § 3582(c) as part of the Crime Control Act of 1984, Congress tasked the Sentencing Commission with defining the phase "extraordinary and compelling," and also required that any judicial order modifying a sentence be "consistent with applicable policy statements" issued by the Sentencing Commission. *See* 28 U.S.C. § 994(t). The Sentencing Commission followed the directive and issued a policy statement, but that policy statement, U.S.S.G. § 1B1.13, has not been updated to reflect changes made by the First Step Act of 2018.[14]

In *United States v. McCoy*, the Fourth Circuit agreed with the majority of lower courts that the current Sentencing Commission policy statement in U.S.S.G. § 1B1.13 does not limit application of compassionate release pursuant to 18 U.S.C. § 3582(c): "As of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling

---

[14] Since the passage of the First Step Act, there have not been enough commissioners to update the Commission's policies or amend the Sentencing Guidelines. *See United States v. Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051 at *2 n.1 (S.D. Iowa Oct. 8, 2019) ("As district courts have noted often this year, the Sentencing Commission has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners.").

reasons' for a sentence reduction."  981 F.3d 271, 283 (4th Cir. 2020).  *See also United States v. Jones*, --- F.3d ---, 2020 WL 6817488, at *6 (6th Cir. Nov. 20, 2020) ("U.S.S.G. § 1B1.13 is not an 'applicable' policy statement when an imprisoned person files a motion for compassionate release").  Indeed, in *McCoy*, the Fourth Circuit affirmed a grant of early release to a defendant based not upon susceptibility to COVID-19, but rather upon the "sheer and unusual" length of the defendant's sentence, and the "gross disparity" between the sentence he received and the one he would receive under today's law, which constituted "extraordinary and compelling reasons" to grant a defendant's release.  *McCoy*, 981 F.3d at 285-86.

**III.    There Are Extraordinary and Compelling Reasons for Release in this Case**

> **A.    Mr. Gaffney's age and health conditions place him at high risk of serious COVID-19 complications.**

Mr. Gaffney is 66 years old and has spent more than 47 of those years in prison. Those years locked away have not been kind to Mr. Gaffney, and his health has deteriorated to the extent he currently suffers from: nuclear cataract, myopia (nearsightedness), presbyopia (farsightedness), enlarged prostate, chronic hepatitis C, anemia, macular degeneration, glaucoma, and hematuria (blood in the urine), among others. [15] *See* Medical Records, attached as Exhibit 1 (filed under seal). Mr. Gaffney also reports that he suffers from moderate asthma.[16]

On October 6, 2020, the CDC updated its guidelines to reflect changing research pertaining to COVID-19.  According to the CDC, the following groups are at increased risk for severe illness or death: (1) older adults; and (2) people with certain medical conditions.  The risk for severe illness from COVID-19 increases with age, with older adults at the highest risk.  Eight out of ten

---

[15] Ex. 1, Medical Records at 1-2 (providing full list of Mr. Gaffney's current conditions)

[16]  In response to defense counsel's request for Mr. Gaffney's medical records, BOP provided records for years 2019-2020 only.  Records from prior years may reflect Mr. Gaffney's treatment for asthma.

COVID-19-related deaths reported in the United States have been among adults aged 65 years and older. For prisoners in particular, "the stress of staying safe behind bars, personal financial woes, drug or alcohol withdrawal, and a history of poor health care can speed up the aging process[.]"[17] Studies have found that the health of inmates is comparable to that of non-incarcerated individuals who are fifteen years older.[18]

The CDC has recognized that the following groups need extra precautions: (1) racial and ethnic minority groups; (2) people living in rural communities; (3) people experiencing homelessness; (4) those who are pregnant and/or breastfeeding; (5) people with disabilities; and (6) people with developmental and behavioral disorders.[19] Regarding racial and ethnic minorities, non-Hispanic black persons experience hospitalization or death at a rate approximately five times that of non-Hispanic white persons. Hispanic or Latino persons have a rate approximately four times that of non-Hispanic white persons.[20]

As we approach one year of the COVID-19 pandemic, older adults such as Mr. Gaffney are still among the most vulnerable populations at risk for serious complications and death from the virus. According to the CDC, "people in their 60s or 70s are, in general, at higher risk of severe illness than people in their 50s."[21] This higher risk equates to adults 65-74 years being five times

---

[17] Maurice Chammah, *Do You Age Faster in Prison?* The Marshall Project (Aug. 24, 2015), available at https://www.themarshallproject.org/2015/08/24/do-you-age-faster-in-prison.

[18] *Id.*

[19] *See* CDC, *People Who Need to Take Extra Precautions*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html.

[20] *Id.*

[21] *See* Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), Older Adults, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html#:~:text=Age%20Increases%20Risk%20for%20Severe%20Illness&text=Similarly%2C%20people%20in%20their%2060s,those%20aged%2085%20or%20older. (last accessed Jan. 18, 2021) (defining "severe illness" as "hospitalization, intensive care, or a ventilator to help them breathe, or they may die")

likelier to be hospitalized compared to 18-29 year-olds, and 220 times likelier to die from COVID-19 than 18-29 year-olds.[22]  Mr. Gaffney is 66 years old, and spending almost his entire adult life in the prison system has been detrimental to his health.  The effects of incarceration on a person's health are well known.  For example, a 2013 study found that each year of incarceration statistically decreases an individual's life by two years.[23]  His list of ailments – including hepatitis C, enlarged prostate, and hematuria – are symptoms of the toll that fifty years of incarceration have taken on his health.[24]  Yet even were he in perfect health, Mr. Gaffney faces a heighted risk of serious complications and death from COVID-19 based on his age alone.

Courts have considered an inmate's age as a key factor in deciding whether to grant compassionate release, granting compassionate release to inmates in their 60s, and younger. *See e.g.*, *United States v. Rojas*, 2020 U.S. Dist. LEXIS 238647, at *2-4 (S.D.N.Y. Dec. 18, 2020) (finding that a 65 year old inmate's "advanced age" in combination with "health conditions" warranted compassionate release); *United States v. Johnson*, No. 18-20073, 2020 WL 5630008, at *3 (E.D. Mich. Sep. 21, 2020) (granting compassionate release for a 61 year old inmate suffering from hepatitis C, hypertension, and other health conditions); *United States v. Grauer*, No. 3:10-cr-00049, 2020 WL 6060927,  at *3-4 (S.D. Iowa Sep. 29, 2020) (granting compassionate release motion for 68 year old inmate citing "advanced age" as one of the reasons); *United States v. Al-*

---

[22] *See* Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), Older Adults, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html#:~:text=Age%20Increases%20Risk%20for%20Severe%20Illness&text=Similarly%2C%20people%20in%20their%2060s,those%20aged%2085%20or%20older. (last accessed Jan. 18, 2021)

[23] Emily Widra, *Incarceration shortens life expectancy*, Prison Policy Initiative, (June 26, 2017), https://www.prisonpolicy.org/blog/2017/06/26/life_expectancy/#:~:text=Each%20year%20in%20prison%20takes,life%20expectancy%20by%205%20years.&text=New%20research%20expands%20the%20notions,post%2Drelease%20barriers%20and%20discrimination ("Time served has a direct correlation to years of life lost").

[24] Medical Records at 1-2.

*Jumail*, No. 12-20272, 2020 WL 2395224, at *6 (E.D. Mich. May 12, 2020) (granting compassionate release for a 60 year old inmate "in light of [inmate's] advanced age and medical conditions"). As in those examples, Mr. Gaffney's advanced age, coupled with the medical conditions described below, are extraordinary and compelling reasons to grant compassionate release.

Mr. Gaffney suffers from chronic hepatitis C, a viral infection which can lead to serious liver disease.[25] Hepatitis C is "a liver infection caused by the hepatitis C virus" and the effects can be "serious, [resulting in] even life threatening health problems like cirrhosis and liver cancer."[26] People with chronic hepatitis C can "often have no symptoms and don't feel sick," only exhibiting symptoms once the infection has progressed to "advanced liver disease."[27] Studies have shown that individuals with pre-existing hepatitis C are at higher risk of death from COVID-19. In an analysis of 941 patient records, researchers found a "considerable risk of morbidity and mortality among COVID-19 patients with HBV and [hepatitis C]."[28] The risks inmates with hepatitis C face from COVID-19 are real and life threatening.

---

[25] See Centers for Disease Control and Prevention, COVID-19, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (listing liver disease as a medical condition which "might be an increased risk for severe illness from the virus that causes COVID-19)

[26] *See* Centers for Disease Control and Prevention, Viral Hepatitis, https://www.cdc.gov/hepatitis/hcv.

[27] *See* Centers for Disease Control and Prevention, Viral Hepatitis, https://www.cdc.gov/hepatitis/hcv/; Stacey Rizza, MD., *Hepatitis C: What happens in end-stage liver disease*, Mayo Clinic https://www.mayoclinic.org/diseases-conditions/hepatitis-c/expert-answers/hepatitis-c/faq-20058533 (stating that "the hepatitis C virus slowly damages the liver over many years, often progressing from inflammation to permanent, irreversible scarring (cirrhosis)")

[28] Hossein Mirzaie et al, *COVID-19 among patients with hepatitis B or hepatitis C: A systematic review*, medRxiv.org (Oct. 23, 2020) https://www.medrxiv.org/content/10.1101/2020.10.22.20216317v1.full (finding that "liver enzyme abnormalities and acute hepatic injuries may be common among COVID-19 patients with HBV and [hepatitis C] co-infections")

10

Courts have granted compassionate release to inmates suffering from hepatitis C. For example, in *United States v. Stephenson*, the court found "extraordinary and compelling reasons" for granting compassionate release for an inmate due to his hepatitis C diagnosis and the effect of this virus on the liver. 61 F. Supp. 3d 864, at 872 (S.D. Iowa May 21, 2020) (rejecting the government's argument that a being cured of hepatitis C alleviates any health risks from COVID-19); *see also United States v. White*, No. 2:17-CR-00198-4, 2020 WL 3244122, at *4 (S.D.W. Va. June 12, 2020) (observing how hepatitis C weakens the immune system and leaves a person susceptible to COVID-19). While the Government may quibble that hepatitis C is not expressly listed by name in the CDC's list of medical conditions which increase the risk of complications from COVID-19, courts have not treated the CDC's guidance so strictly.  In *United States v. Ludwig*, the court granted compassionate release for an inmate suffering from hepatitis B and C, rejecting the government's arguments that hepatitis was not specifically "recognized by the CDC as a high-risk factor for COVID-19 complications." 2020 WL 4547347, at *4-5 (E.D. Cal. Aug. 6, 2020) (noting that the "CDC recommends individuals with liver disease, which can include disease caused by [h]epatitis B and C"). Further, even though the hepatitis was in remission, the court ruled that because the inmate's hepatitis "puts him at high risk of suffering serious, possibly life threatening, medical consequences if he contracts COVID-19," compassionate release was warranted. *Id.* at *5.

Mr. Gaffney's hepatitis C has gone untreated by the BOP since 1998, and Mr. Gaffney has only recently begun treatment. [29] As recently as March 28, 2019, Mr. Gaffney pleaded with BOP for treatment for his hepatitis C, but was denied any medication because the BOP believed Mr.

---

[29] Medical records at 12-13.

Gaffney did not have hepatitis C.[30] It was not until an October 7, 2020 clinic visit that the BOP checked Mr. Gaffney's records and discovered a positive hepatitis C test from 1998.[31] On December 23, 2020, the BOP finally approved the medication to treat Mr. Gaffney's hepatitis C infection.[32] This delayed treatment does not undo the twenty years this virus has lived in Mr. Gaffney's body, likely damaging his liver to an extent that will soon manifest in life-threatening liver disease.

In addition to his advanced age and hepatitis C, Mr. Gaffney suffers from an enlarged prostate which may be a sign of a more serious condition.[33] Since 2008, Mr. Gaffney's medical records show several recurring diagnoses of a: "very large prostate," elevated prostate-specific antigen ("PSA"), and high grade prostatic intraepithelial neoplasia ("PIN").[34] PSA is measured to "screen for prostate cancer in men without symptoms,"[35] while a high grade PIN is considered a sign of "pre-cancer of the prostate."[36] The American Cancer Society associates a PSA between 4 and 10 with a "1 in 4 chance of having prostate cancer," while a PSA of more than 10 corresponds to a 50 percent chance of prostate cancer.[37] A September 22, 2020 clinic visit report reflects that Mr. Gaffney's PSA was 9.76, and Mr. Gaffney's medical records show a high grade PIN in 2008,

---

[30] Exhibit 2 (June 10, 2019 BP-229 Response to Mr. Gaffney's Request for Administrative Remedy).

[31] Medical Records at 11.

[32] Medical Records at 13.

[33] Medical Records at 1.

[34] Medical Records at 1, 8.

[35] American Cancer Society, Tests to Diagnose and Stage Prostate Cancer, https://www.cancer.org/cancer/prostate-cancer/detection-diagnosis-staging/how-diagnosed.html

[36] American Cancer Society, Understanding Your Pathology Report: Prostatic Intraepithelial Neoplasia (PIN) and Intraductal Carcinoma, https://www.cancer.org/treatment/understanding-your-diagnosis/tests/understanding-your-pathology-report/prostate-pathology/high-grade-prostatic-intraepithelial-neoplasia.html

[37] American Cancer Society, Tests to Diagnose and Stage Prostate Cancer, https://www.cancer.org/cancer/prostate-cancer/detection-diagnosis-staging/how-diagnosed.html

2009, and 2014.[38]  While a 2009 biopsy found no cancer in Mr. Gaffney's prostate, his history of precursors – including a lab result showing Mr. Gaffney at almost a 50 percent chance of having prostate cancer – are worrying signs for his long-term health.  He is scheduled to have follow-up testing.  *Id.*

B.  COVID-19 Within BOP and the Florence Correctional Complex

The Court is undoubtedly familiar with the threat posed by COVID-19, particularly in the prison setting, where social distancing and hygiene recommended by the CDC are very difficult to achieve.  As the Supreme Court has noted, "[j]ails are often crowded, unsanitary, and dangerous places." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 333 (2012). Accordingly, "[t]he danger of introducing . . . contagious infections, for example, is well documented." *Id*. at 330-31.  Not surprisingly, COVID-19 is tearing through the BOP at a rate exponentially higher than it is spreading elsewhere in the United States.  Indeed, test results show that up to 70% of inmates in BOP facilities who have been tested have tested positive for COVID-19.[39]

This is because conditions of confinement create the ideal environment for the transmission of contagious disease.[40]  "Prisons are petri dishes for contagious respiratory illnesses."[41]  Inmates cycle are restricted in their movements, and people who work in the facilities leave and return

---

[38] Medical Records at 1, 10.

[39] https://www.nytimes.com/aponline/2020/04/30/us/politics/ap-us-virus-outbreak-federalprisons.html ("And even though officials have stressed infection and death rates inside prisons are lower compared with outside, new figures provided by the Bureau of Prisons show that out of 2,700 tests systemwide, nearly 2,000 have come back positive, strongly suggesting there are far more COVID-19 cases left uncovered.")

[40] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[41] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

daily.  According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[42]  The conditions of confinement not only affect incarcerated individuals, but also the community at large.  "With 2.3 million people in the United States in prison or jail on any given day, an outbreak in these facilities poses a threat to the entire country."[43]

Over the course of the last ten months, the BOP has demonstrated that it simply cannot handle this public health crisis.  According to BOP's own numbers, 34 percent of BOP inmates have contracted COVID-19.  Of those inmates who have been tested, almost 43 percent have tested positive.[44]  Even if all inmates *were* tested, medical experts explain that routine, institution-wide diagnostic testing should take place, given the frequency of asymptomatic infection and the importance of early recognition of COVID-19 outbreaks in carceral facilities.[45]  "Where feasible and available, these facilities should consider using rapid antigen tests to test both inmates and staff on a regular basis, perhaps weekly, to identify outbreaks early and prevent onward transmission."[46]  In other words, one test at one point in time is not enough.  Regular and systematic

---

[42] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[43] *Explainer: Prisons and Jails Are Particularly Vulnerable to COVID)-19 Outbreaks*, The Justice Collaborative, available at https://thejusticecollaborative.com/wpcontent/uploads/2020/03/TJCVulnerabilityofPrisonsandJailstoCOVID19Explainer.pdf.

[44] These numbers are self-reported by the BOP, and are available at: https://www.bop.gov/coronavirus/ (as of January 14, 2021, there are 123,052 inmates in BOP prisons; 42,391 inmates have tested positive, and 98,164 inmates have been tested at some point).

[45] Watson C., Warmbrod L., Vahey R., et al. *COVID-19 and the US Criminal Justice System: Evidence for Public Health Measures to Reduce Risk*.  Baltimore, MD: Johns Hopkins Center for Health Security; 2020, at 18.

[46] *Id*.

testing is clearly not happening in BOP facilities.  And the BOP refuses to report testing data for staff members, contractors, and other individuals who enter and leave the facility each day—the individuals who are most likely to be exposed to the virus in the first place and then bring it into the prison setting.  These concerns are echoed by corrections officers themselves.  For example, a correctional officer at FCI Loretto stated that he and his fellow staff members were not even offered testing.  He stated further, "In the 12 years in corrections, this is probably the scariest thing I've had to deal with, and the most stressful thing."[47]  Perhaps most disturbingly, to date, 217 inmates and 4 staff members have died from COVID-19.[48]

Regardless of the BOP's best efforts, the infection rate in federal prisons is more than five times higher than the infection rate in the general population in the United States,[49] and the fact remains that the virus is present at USP Florence ADX.  As of January 14, 2021, the BOP website reported that there were 28 current cases of COVID-19 among staff at the facility, in addition to 3 inmates who had "recovered" from the virus, and 77 inmates who have so far tested positive for COVID-19.  As of February 9, 2021, BOP lists 28 positive staff members as now recovered.[50]

Given the lack of testing and the fact that a large percentage of those infected are asymptomatic, the unfortunate reality is that there are likely more positive cases at the facility that

---

[47] Lisa Riordan Seville, *'Like a war zone': Prison that freed Paul Manafort early now ravaged by Covid*, NBC News, available at https://www.nbcnews.com/news/us-news/war-zone-prison-freed-paul-manafort-early-now-ravaged-covid-n1251783 (Dec. 19, 2020).

[48] Federal Bureau of Prison, Covid-19 Coronavirus, https://www.bop.gov/coronavirus/ (last visited Feb. 9, 2021).

[49] According to the BOP's coronavirus information page on January 21, 2021 (https://www.bop.gov/coronavirus/), there have been a total of 42,970 BOP inmates testing positive for COVID-19, out of 123,039, yielding an infection rate of 34.9%. As for the United States population of approximately 328 million, there have now been a reported 24.135 million positive cases according to the CDC COVID Data Tracker (https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days), yielding an infection rate of 7%.

[50] Federal Bureau of Prison, Covid-19 Coronavirus, https://www.bop.gov/coronavirus/

are not reported.  In addition, the strain placed on the facility by having to fight COVID-19 has been exacerbated by the "logistical nightmare" of positive cases among staff members at the Florence Correctional Complex.[51] A former correctional officer at the FCC Florence described the conditions for current staff members as "much more than an inconvenience – it means not enough sleep, they are not eating right and there's a chance they can get COVID because their immune system is compromised.  It is scary, and my concern is staff safety."[52]  Protecting inmates from this pandemic is a challenging endeavor for even fully staffed facilities, and to attempt to do so with a depleted staff seriously augments that challenge.

Indeed, in granting compassionate release, many courts have acknowledged that vulnerable defendants like Mr. Gaffney are at grave risk *despite* BOP precaution. "Even in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others." *United States v. Esparza*, No. 1:07-cr-00294-BLW, 2020 WL 1696084 (D. Idaho. Apr. 7, 2020); *see also United States v. Muniz*, Case No. 4:09-cr-199, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020) ("[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers . . . demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection.").

---

[51] Tracy Harmon, F*ederal Prison Staffing in Florence a 'logistical nightmare' Amid Coronavirus Pandemic*, The Pueblo Chieftain, (Dec. 11, 2020), https://www.chieftain.com/story/news/2020/12/11/florence-federal-prison-worker-details-covid-19-staffing-strain/6513673002/

[52] Tracy Harmon, F*ederal Prison Staffing in Florence a 'logistical nightmare' Amid Coronavirus Pandemic*, The Pueblo Chieftain, (Dec. 11, 2020), https://www.chieftain.com/story/news/2020/12/11/florence-federal-prison-worker-details-covid-19-staffing-strain/6513673002/

Courts have granted compassionate release to inmates at the Florence Correctional Complex. *See e.g., United States v. Luker*, No. 4:13-CR-261, 2020 WL 5774934, at *1 (E.D. Tex. Sep. 25, 2020) (granting inmate's compassionate release from the USP Florence high security facility); *United States v. Harris,* No. 06-cr-30058, 2020 WL 3483559, at *1 (C.D. Ill. June 26, 2020) (granting compassionate release for an inmate incarcerated at USP Florence). Given the presence of the virus at the Complex, and Mr. Gaffney's particularized susceptibility to severe illness or death should he contract it, this Court should do the same.[53]

C. Mr. Gaffney's Life Sentence

In addition to Mr. Gaffney's susceptibility to COVID-19, this Court should grant relief under § 3582(c)(1)(A) on the ground that Mr. Gaffney's life sentence is unjust because it was imposed under the then-mandatory sentencing guideline regime that was later declared unconstitutional by the Supreme Court in *United States v. Booker*. At the time of his sentencing in 1995 (and resentencing in 1996), the law in effect required the Court to impose a sentence within the range established by the sentencing guidelines. For Mr. Gaffney, whose offense level was calculated at level 44 based on the quantity of drugs attributed to him, the sentencing guidelines

---

[53] Shortly before filing this motion, undersigned counsel received information from Mr. Gaffney that he received the initial dose of a COVID-19 vaccine. Undersigned counsel does not know when Mr. Gaffney received the first dose, which vaccine he received, or when he will receive the second dose. Given the continuing susceptibility between doses and even after the second dose is administered, the extraordinary and compelling reasons to reduce Mr. Gaffney's sentence remain the same. As seen with the high infection rate during the events at the U.S. Capitol on January 6, 2021, the fact that several lawmakers became infected in close quarters indoors shortly after receiving the vaccine serves as "a reminder that people can still be vulnerable to infection after being vaccinated, particularly in the two weeks after receiving the second dose." Wang et. al., *Two lawmakers test positive for coronavirus, one after receiving both doses of vaccine*, Wash. Post (Jan. 30, 2021) https://www.washingtonpost.com/politics/2021/01/30/two-lawmakers-test-positive-coronavirus-one-after-receiving-both-doses-vaccine/. Moreover, there is much uncertainty regarding whether the current vaccines offer immunity to the new and highly contagious variants of the virus that are sweeping across populations around the world.

did not establish a sentencing range but, rather, directed a sentence of life.[54]  This Court imposed a life sentence as it was required to do.

The Supreme Court's 2005 ruling in *United States v. Booker* came too late for Mr. Gaffney. He was sentenced to spend the entirety of his life in prison, a sentence far longer than the average federal sentence imposed on defendants convicted of murder.  *See United States v. Bryant*, No. 95-CR-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months").

In the words of one court in this district, Mr. Gaffney is part of a "lost generation" of defendants sentenced before the Supreme Court's decision in *Booker* whose draconian guideline-mandated sentence would be illegal today but who have no avenue for collateral attack:

> The undercutting of *Booker*'s core remedial measure has created a lost generation, a group caught in a national purgatory, where individual citizens pay penance for the constitutional errors of the sovereign. For twenty years of this nation's history, at the height of what has been called the "crack epidemic," harsh sentences which disproportionately impacted African Americans were imposed based in unconstitutionally high guideline ranges. Although courts now have the discretion to depart from the Guidelines as they see fit after *Booker*, they could not review the sentences of this twenty-year period, leaving those individuals to serve their sentences based on an unconstitutional framework.

*Jones v. United States*, 431 F.Supp.3d 740, 743-44 (E.D. Va. 2020) (RAJ).

There is no dispute that the offense conduct for which Mr. Gaffney was convicted was immensely serious and involved physical assaults.  A significant sentence was justified.  When measured against the sentences imposed for federal murder convictions and comparable heinous conduct, a life sentence with no possibility of release was not.  *See McCoy*, 981 F.3d at 286 (district court permissibly found "extraordinary and compelling reasons"  for compassionate release based

---

[54] Mr. Gaffney's "life" guideline calculation was driven not by the assaults for which he was convicted, but by the drug weight attributed to him.  *See* PSR, Worksheet A.

on the severity of the defendant's sentence and the disparity between the sentence that the defendant would receive if sentenced under current law).

**IV.    Releasing Mr. Gaffney is Appropriate Given The Length of His Incarceration And His Rehabilitation While Incarcerated**

The compassionate release statute, 18 U.S.C. § 3582(c), directs the court to consider the applicable § 3553(a) factors in determining whether to grant release for extraordinary and compelling reasons.  Here, the factors support compassionate release for Mr. Gaffney.

A.  <u>At 66 years old and more than 20 years removed from his last conviction, the § 3553(a) factors support release.</u>

Mr. Gaffney is not the same person who entered the criminal justice system as a teenager nearly fifty years ago.  Nor is he the same person who was convicted in this court in 1995.  There is no dispute as to the seriousness of Mr. Gaffney's prior conduct.  But in assessing whether he presents a present risk to the community, his 14 years of good conduct in BOP, under the most draconian custodial conditions, should be given significant weight.   Mr. Gaffney reportedly last received an incident report in 2007, for possessing documents (sent to him by his attorney) that he was not permitted to have under the facility's rules.  Upon information and belief, on more than one occasion, wardens of Florence ADX have recommended that Mr. Gaffney be transferred from the Supermax facility, presumably based on his decade-plus of good behavior, but for unknown reasons, Mr. Gaffney has not yet received a transfer.[55]

As reflected on his progress report, Mr. Gaffney has fully committed to his goal of rehabilitation while in prison, taking more than fifty courses covering a wide range of subjects

---

[55] BOP's reluctance to transfer Mr. Gaffney may stem not from his own conduct but instead from a concern for what his release would mean to the racial strife that continues to plague the prison system in this country.  While the Aryan Brotherhood today may be far different than it was 20 years ago when Mr. Gaffney was among its targets, the organization continues to exist.

19

over the past twenty years.  That he has done so while detained at USP Florence ADX is extraordinary.

In considering similar requests for compassionate release, many courts have balanced a defendant's history of violence against a host of factors, including the defendant's rehabilitation and time since the violent acts were committed.[56]  For example, in *United States v. Brown*, the court balanced the inmate's criminal history of "violent bank robbers" along with an "extensive" criminal history against the age when he committed these crimes, his history of good behavior in prison, and his extensive rehabilitation while incarcerated. No. ELH-01-377, 2020 U.S. Dist. LEXIS 176757, at *21-28 (D. Md. Sep. 25, 2020) (granting compassionate release); *see also United States v. Echevarria*, No. 3:17-cr-44 (MPS), 2020 U.S. Dist. LEXIS 77894, at *7 (D. Conn. May 4, 2020) (granting compassionate release when balancing the "violent offense was committed over 18 years ago" against "substantial rehabilitative efforts");  *United States v. Ladson*, No. 04-697-1, 2020 U.S. Dist. LEXIS 108551 (E.D. Pa. June 22, 2020) (granting compassionate release to an inmate convicted of violent robberies which took place "many years ago").

Finally, Mr. Gaffney is an elderly man who is unlikely to recidivate. The United States Sentencing Commission has acknowledged recidivism declines with age.[57]  The Sentencing Commission recently studied the recidivism rates of defendants released early pursuant to the "drugs minus two" amendment to the United States Sentencing Guidelines.  The Commission found that "[t]here was no statistically significant difference in the recidivism rates of offenders

---

[56] *See e.g., United States v. Scott*, No. 95-202-CCB-2, 2020 U.S. Dist. LEXIS 84313 (D. Md. May 13, 2020) (granting compassionate release for inmate convicted of counts of bank robbery and using a firearm during the commission of a crime of violence)

[57] *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, Ex. 9 (2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research publications/2004/200405_Recidivism_Criminal_History.pdf.

released early pursuant to retroactive application of the Drugs Minus Two Amendment and a comparable group of offenders who served their full sentences."[58]

Indeed, while courts carefully evaluate a defendant's offense conduct and history, courts have not shied away from granting compassionate release to inmates serving life sentences. *See, e.g., United States v. Gluzman*, 2020 WL 4233049 (S.D.N.Y. July 23, 2020) (granting compassionate release to a defendant who meticulously planned and carried out the violent murder of her husband, finding that the 24 years she spent incarcerated for pre-meditated murder "reflects the seriousness of the offense, promotes respect for the law, and provides just punishment," in addition to adequate deterrence and protection of the public); *United States v. Tidwell*, 2020 WL 4504448, at *11 (E.D. Pa. Aug. 5, 2020) (releasing a man serving a life sentence for, among other things, two counts of murder in furtherance of a continuing criminal enterprise); *United States v. Walls*, Case No. 92-CR-80236-RHC, Dkt. No. 736, 2020 WL 1952979 (E.D. Mich. Apr. 23, 2020) (granting compassionate release to the leader of a "large-scale drug distribution and money laundering conspiracy" who "was justifiably sentenced to spend the balance of his life in prison" and "was deemed a significant threat to the safety of others and the community"); *United States v. Hourani*, Case No. 2:95cr80071, Dkt. No. 215 (E.D. Mich. Sept. 18, 2020) (granting compassionate release to a defendant serving a mandatory life sentence for witness tampering by murder, based on the defendant's rehabilitation alone); *United States v. Fisher*, 2020 WL 5992340 (S.D.N.Y. Oct. 9, 2020) (reducing a life sentence for involvement with a violent narcotics ring to time-served in light of the defendant's admirable rehabilitation and the COVID-19 pandemic); *United States v. Lopez*, 2020 WL 6298061 (D. Haw. Oct. 27, 2020) (granting compassionate

---

[58] *See* United States Sentencing Commission, *Retroactivity & Recidivism: The Drugs Minus Two Amendment* (July 8, 2020), available at https://www.ussc.gov/research/research-reports/retroactivity-recidivism-drugs-minus-two-amendment.

release to a defendant sentenced to life for carrying and using a firearm during and in relation to a drug trafficking conspiracy, and in the course of that conspiracy, committing first-degree murder, among other serious offenses); *United States v. Vega*, 2020 WL 7060153 (E.D.N.Y. Dec. 2, 2020) (granting compassionate release to a defendant who was "second-in-command" of a narcotics organization that "caused murder, maiming, kidnapping, and destruction"); *United States v. Rios*, 2020 WL 7246440 (D. Conn. Dec. 8, 2020) (granting compassionate release to a member of the Latin Kings gang who was convicted of RICO conspiracy, violent crime in aid of racketeering (murder), and conspiracy to possess with intent to distribute narcotics, for which he received three concurrent life sentences in 1995); *United States v. Curtis*, 2020 WL 1935543 (D.D.C. Apr. 22, 2020) (granting compassionate release to a defendant serving six concurrent terms of life imprisonment for operating a sex trafficking ring involving minors).

*See also United States v. McGraw*, No. 202-cr-00018, 2019 WL 2059488, at *2 (S.D. Ind. May 9, 2019) (granting compassionate release for an inmate who had served 17 years of a life sentence); *United States v. Johns*, No. 91-cr-392, 2019 WL 2646663, at *3 (D. Ariz. June 27, 2019) (granting compassionate release for an inmate who had served 23 years of a life sentence); *United States v. Parker*, 461 F. Supp. 3d 966 (C.D. Cal. 2020) (granting compassionate release for an inmate who served 22 years of a life sentence).

B. <u>Client Has a Viable Release Plan</u>

Mr. Gaffney has a surfeit of family support in the Washington D.C. area and multiple family members who are eager to provide him with a home and extensive support should he be released. Undersigned counsel has been in communication with Mr. Gaffney's daughter, born months after his arrest in 1973. She used to visit her father when he was imprisoned in Virginia, but has not been able to see him in more than 20 years, since his transfer to USP Florence. She

wants nothing more than to have her father home with her in Maryland, and would provide critical support to assist him with a successful reentry into the community.  His daughter is one of many of relatives waiting for the opportunity to support and care for Mr. Gaffney upon his release.

In sum, there is no doubt that Mr. Gaffney's prior criminal conduct was serious.  The man Mr. Gaffney is today is very different from the man who sentenced in 1996 and 1973.  He has been rehabilitated through education and peaceful living while incarcerated at USP Florence ADX.  He has support from his family in the community to which he plans to return.  In short, the length of Mr. Gaffney's sentence should not prevent his release when balanced against his age, medical condition, rehabilitation, and release plan.

## CONCLUSION

For all of the reasons above, Mr. Gaffney respectfully requests that this Court grant compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

Respectfully submitted,

KEITH EUGENE GAFFNEY

_____/s/_____

Shannon S. Quill, Esq.
Virginia Bar No. 76355
Assistant Federal Public Defender
Attorney for K. Gaffney
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0850 (T)
Shannon_Quill@fd.org (e-mail)

23

**CERTIFICATE OF SERVICE**

I certify that on this 11th day of February, 2021, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification (NEF) to all counsel of

record.

_____/s/_____

Shannon S. Quill, Esq.
Virginia Bar No. 76355
Assistant Federal Public Defender
Attorney for K. Gaffney
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0850 (T)
Shannon_Quill@fd.org (e-mail)
