IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:95-cr-53 |
| | ) | |
| KEITH EUGENE GAFFNEY, | ) | The Hon. Leonie M. Brinkema |
| | ) | |
| *Defendant.* | ) | |

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

The United States files this response in opposition to the motion for compassionate release
by the defendant, under 18 U.S.C. § 3582(c)(1)(A)(i). The defendant was sentenced to life
imprisonment for managing a narcotics distribution ring at the Lorton Reformatory in Lorton,
Virginia. Specifically, following a trial, the defendant was convicted by a jury of engaging in a
continuing criminal enterprise, assault with intent to commit robbery, assault with a dangerous
weapon, and possession with intent to distribute .286 grams of hydromorphone. (ECF No. 67.)
He seeks early release from prison due to his age, medical conditions, and the length of his
sentence. (ECF No. 179 at 7.) He is currently serving a life sentence imposed by the District of
Columbia Superior Court and a life sentence for the convictions in the above-captioned case is
pending as a detainer against him. Because the defendant is fully vaccinated and his facility does
not make him more susceptible to contracting COVID-19 in light of the few cases there, and
because the statutory sentencing factors in 18 U.S.C. § 3553(a) weigh against release, the Court
should deny his motion.

**Background**

**I.      Facts and Procedural History**

According to the Presentence Investigation Report ("PSR"), between 1989 and 1994, while

the defendant was incarcerated at the Lorton Reformatory, he used a network of visitors and correctional officers to receive heroin, hydromorphone, and other contraband. (PSR ¶ 9.) He would then cut, package, and sell the narcotics using drug runners. (*Id.*) On average, the defendant generated approximately $1,000 in proceeds per day. (PSR ¶ 11.) The United States calculated that the defendant distributed between 11.8 and 17.7 kilograms of heroin over the course of the four-year enterprise (based on two to three ounces of heroin per week). (PSR ¶ 13.)

As part of the enterprise, numerous instances of violence occurred at the defendant's direction. For example, the United States established at the defendant's trial that in February 1992, the defendant gave two conspirators heroin in exchange for them to stab an individual with a pair of scissors to steal a gold chain from him. (PSR ¶ 20.) In August 1992, the defendant gave another conspirator heroin in exchange for him to stab an individual with a shank for cooperating with the authorities. (PSR ¶ 29.) In June and July 1993, the defendant and conspirators plotted to murder a correctional officer for interfering with the defendant's drug trafficking. (PSR ¶ 31.)

On February 9, 1995, the defendant was charged with conspiracy to possess and distribute heroin and hydromorphone, in violation of 21 U.S.C. § 846 (Count 1), engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(b) (Count 2), obstruction of justice, in violation of 18 U.S.C. §§ 2, 1503 (Count 3), three counts of assault with a dangerous weapon, in violation of 18 U.S.C. §§ 2, 113(c) (Counts 4, 6, 8), assault with intent to commit robbery, in violation of 18 U.S.C. §§ 2, 113(b) (Count 5), assault, in violation of 18 U.S.C. §§ 2, 113(d) (Count 7), possession with intent to distribute hydromorphone, in violation of 21 U.S.C. § 841(a) (Count 9), and assault with intent to commit murder, in violation of 18 U.S.C. §§ 2, 113(a) (Count 10). (PSR ¶ 1; ECF No. 1.)

The parties proceeded to trial before the Honorable James C. Cacheris. On May 23, 1995,

the jury convicted the defendant on Counts 1, 2, 5, 8 and 9, and found him not guilty on Counts 3, 4, 6, 7, and 10.  (PSR ¶ 2; ECF No. 67.)  In other words, the jury found the defendant guilty of conspiracy to possess and distribute heroin and hydromorphone; engaging in a continuing criminal enterprise; assault with intent to commit robbery, assault with a dangerous weapon, and possession with intent to distribute hydromorphone.

During his interview for the PSR, the defendant denied involvement in the offense, and stated that he had been used as a "'scapegoat' for the corruption in the District of Columbia Department of Corrections." (PSR ¶ 44.)  He reiterates this notion in his motion for compassionate release, stating that he was indicted "based on the purchased testimony of admitted drug addicts, and inmates testifying for plea bargains on their pending cases, and paid inmates who were government informers who admitted under oath that they were paid to testify on other Lorton, prison cases."  (ECF No. 179 at 2.)

On September 27, 1995, the Honorable James C. Cacheris sentenced the defendant to life imprisonment as to Counts 1 and 2, 10 years' imprisonment for Counts 5 and 8, and 20 years' imprisonment as to Count 9, to run concurrently.  (Minute Entry, Sept. 27, 1995.)  The Court also sentenced the defendant to a five-year term of supervised release on Counts 1, 2, and 9, and a three-year term of supervised release on Counts 5 and 8, to run concurrently to each other.  (*Id.*) This sentence was imposed consecutively to the term of imprisonment he was serving at that time for convictions in D.C. Superior Court.  (*Id.*)

On September 11, 1996, the U.S. Court of Appeals for the Fourth Circuit affirmed the defendant's convictions, with the exception of Count 1—conspiracy to possess and distribute heroin and hydromorphone in violation of 21 U.S.C. § 846.  *See United States v. Gaffney*, 96 F.3d 1439, 1996 WL 515241, at *1 n.2 (4th Cir. 1996).  The parties agreed that the defendant could not

be convicted of the conspiracy charge if the continuing criminal enterprise charge were upheld, so the conspiracy conviction was vacated. *Id.*

On November 19, 1996, the Court resentenced the defendant to life imprisonment on Count 2, 10 years' imprisonment as to each of Counts 5 and 8, and 20 years' imprisonment as to Count 9. (ECF No. 119.) These sentences were again imposed consecutively to the sentence that the defendant was currently serving. (*Id.*) He was again resentenced to a five-year term of supervised release on each of Counts 2 and 9, and a three-year term of supervised release on Counts 5 and 8, to run concurrently with each other. (*Id.*)

At the time of the defendant's conduct in the instant offense, he was incarcerated at the Lorton Reformatory for his convictions in D.C. Superior Court. Specifically, in 1973, the defendant and another individual, Willie Engram, were charged in D.C. Superior Court with assault with intent to rape while armed, assault with intent to kill while armed, two counts of armed robbery, two counts of rape while armed, kidnapping, carrying a pistol without a license, burglary I while armed, and armed burglary. (PSR ¶ 56.) On July 29, 1973, the defendant and Engram were in the home of "Victim-1," along with "Victim-2" and "Victim-3." While in Victim-1's home, the defendant and Engram held Victim-1 at gunpoint, demanded narcotics, and then shot her in the chest. (*Id.*) The defendant and Engram robbed the victims in the home, and Engram raped Victim-2. (*Id.*) The defendant and Engram proceeded to kidnap Victim-2 and rape her throughout the day. (*Id.*) They eventually took Victim-2 to the home of Victim-4, and the defendant later robbed, raped, and threatened to kill Victim-4 over the course of eight hours. (*Id.*) On November 14, 1985, the defendant was originally sentenced to 75 years to life imprisonment for these crimes, but his sentence was modified to 40 months to 10 years' imprisonment on the carrying a pistol without a license count, 10 years to life imprisonment on one of the armed robbery

counts, and 12 years to life imprisonment on the remaining counts.  (*Id.*)

On November 18, 2020, the defendant requested compassionate release from the warden of USP Florence, where the defendant is currently incarcerated.  (ECF No. 179-2.)  The warden denied his request on December 3, 2020.  (ECF No. 179-3.)  In the denial, the warden stated that the defendant did not meet the criteria for a reduction in sentence, because he had not served 50% of his sentence, and "conventional treatment will provide a substantial improvement" to his physical conditions.  (ECF No. 179-3.)

On December 28, 2020, the defendant filed a *pro se* motion requesting compassionate release. (ECF No. 179.)  In his motion, he claimed that his age and medical conditions—including Hepatitis C, macular degeneration, enlarged prostate, and moderate asthma—justified compassionate release.  (*Id.* at 7.)  He also requested release based on the fact that he has been incarcerated at USP Florence ADMAX for 24 years.  (*Id.* at 8.)  Simultaneous with his motion for compassionate release, the defendant filed a request for the Court to appoint the defendant counsel. (ECF No. 180.)

On December 31, 2020, the Court granted the defendant's motion to appoint counsel, and appointed the Office of the Federal Public Defender to supplement the defendant's motion.  (ECF No. 182.)  The Court concluded that the defendant exhausted his administrative remedies, and noted that it will not address issues raised by the defendant regarding "the legitimacy of his conviction and sentence." (*Id.*)  The defendant's appointed counsel filed a response on February 11, 2021, (ECF No. 183), and the United States now responds.

Based on the records provided by the Bureau of Prisons ("BOP"), the sentence imposed by the Court in the instant case is listed as a detainer against the defendant, as he is technically still

serving the sentence imposed in D.C. Superior Court.[1]  *See* Ex. 1.  Thus, even if this Court were to reduce his sentence, he still must serve his sentences for his D.C. convictions of 12 years to life imprisonment.  (PSR ¶ 60.)  As a result, even if this Court were inclined to grant immediate release, it is not clear that the defendant would be released in actuality.

## II.   The BOP has Taken Extensive Measures to Mitigate the Effects of COVID-19 in its Facilities

Since the onset of the COVID-19 pandemic, the BOP has adopted measures to contain the spread of the virus within prisons.  In appropriate cases, the BOP has released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.[2]  The BOP has also begun vaccinating inmates and staff.  Further, the BOP has limited access to prisons, restricted prisoner movement within prisons, required screening and testing, provided masks and hand cleaners, separated ill inmates from the rest of the population, and educated inmates and staff on preventing the spread of disease.

Before Congress enacted the CARES Act, § 3624(c)(2) authorized the BOP to "place a prisoner in home confinement" only "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months."  As part of the CARES Act, Congress sought to address the spread of COVID-19 in prisons by temporarily authorizing the BOP to expand the use of home confinement under § 3624(c)(2).  Accordingly, during the coronavirus emergency, the Act suspends the limitation that restricts home confinement to the shorter of 10 percent of the inmate's sentence or

---

[1] Based on undersigned counsel's understanding, the defendant is serving a sentence from D.C. Superior Court in a federal facility because Washington, D.C. no longer has its own prisons, so defendants are transferred to the custody of the BOP and incarcerated in federal facilities to serve their D.C. sentences.

[2] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act").

6 months, provided that the Attorney General finds that "emergency conditions will materially affect the functioning" of the BOP.[3]   CARES Act § 12003(b)(2).  The Attorney General made those findings on April 3, 2020, conferring on the BOP the authority to expand its use of home confinement.    Memorandum  from  Attorney  General  to  BOP  Director  (Apr.  3,  2020), https://www.justice.gov/file/1266661/download.

The BOP has been "reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention ("CDC"), to determine which inmates are suitable  for  home  confinement."    *COVID-19  Home  Confinement  Information*,  BOP, https://www.bop.gov/coronavirus/ (last visited Mar. 11, 2021).  There are currently 7,532 inmates on home confinement, and the BOP has placed a total of 22,708 inmates in home confinement since March 26, 2020.  *Id.*

Inmates do not have to apply to be considered for home confinement.  The BOP considers such factors as the "age and vulnerability of the inmate to COVID-19," consistent with CDC guidelines; the security level of the inmate's facility, giving priority to those in low and minimum security facilities; the inmate's conduct while in prison; whether the inmate has a release plan "that will prevent recidivism and maximize public safety"; and the "danger posed by the inmate to the community."   Memorandum from Attorney General to BOP Director 1–2 (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.   Additionally,  the BOP must assess the inmate's risk factors and grant home confinement only after determining that "transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-

---

[3] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

19." *Id.* at 2.  To protect the public against further spread of the coronavirus, the BOP requires every inmate granted home confinement to quarantine for 14 days before his or her release.  *Id.*  In this case, the BOP informed the United States that the defendant is not being considered for home confinement under the CARES Act due to his life sentence, as well as the pending detainer from this District, his current violent offense, his current sexual offense, his classification as a High security inmate, and a PATTERN score of Medium risk recidivism level.

The BOP has also begun administering vaccines to inmates and staff.  As of March 11, 2021, the BOP has administered a total of 78,225 doses of the COVID-19 vaccine.  *COVID-19 Vaccine Implementation*, BOP, https://www.bop.gov/coronavirus/.  After offering the vaccine to all employees, institutions will give priority to inmates assigned to work in health service units and inmates in nursing care centers or other residential care units.  *COVID-19 Vaccine Guidance*, BOP 6 (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  Next, priority will be given to inmates age 65 or older and inmates of any age who, based on CDC criteria, "are at increased risk" for severe illness from COVID-19 due to one or more medical conditions.  *Id.*  The third level of priority for vaccine administration includes inmates between 50 and 64 years old and inmates of any age who, based on CDC criteria, "might be at increased risk" for severe illness from COVID-19 due to one or more medical conditions.  *Id.* at 7.  Vaccines will then be available to all other inmates.  *Id.*

The BOP is also operating under modified conditions to reduce the spread of COVID-19 in its facilities.  All inmates and staff have been issued facial coverings to use, particularly when it is not possible to social distance.  *Correcting Myths and Misinformation About BOP and COVID-19*, BOP (May 6, 2020), https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.

pdf. Common areas are sanitized multiple times per day. *Id.* at 3. Additionally, medical staff screen every newly admitted inmate for COVID-19. *BOP Modified Operations*, BOP (Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp. Inmates who are asymptomatic and test negative are placed in quarantine for 14 days. *Id.* Inmates who are symptomatic and/or test positive are placed in medical isolation. *Id.*

Medical staff also conduct rounds and check inmate temperatures at least daily. *Correcting Myths and Misinformation About BOP and COVID-19*, at 1. Inmates' movements are "limited" to "prevent congregate gathering and maximize social distancing," with movement "in small numbers" permitted to access the commissary, laundry, showers, and phones. *BOP Modified Operations*. Movement is also still permitted for mental health and medical care. *Id.*

Inmates who are transferring between facilities, moving to other correctional jurisdictions, or being released from BOP custody must quarantine for 14 days and test negative before transfer. *Id.* The BOP will not transfer or release inmates with active COVID-19 "unless absolutely necessary." *Id.* For immediate releases where the inmate could not quarantine for 14 days, the BOP provides a symptom screen, temperature check, and COVID-19 test on the day of departure and notifies the health authorities in the local jurisdiction if necessary. *Id.*

The BOP also conducts temperature checks and COVID-19 screening for staff, contractors, and other visitors to its facilities. *Id.* Anyone who registers a temperature of 100.4 degrees Fahrenheit or higher cannot enter the building. *Id.* Staff who exhibit symptoms are sent home. *Correcting Myths and Misinformation About BOP and COVID-19*, at 3.

The BOP previously suspended social visits but has since reinstated visits, directing each institution to adopt a visiting plan consistent with its resources, including space. *BOP Modified*

*Operations*.  Visits are "non-contact" and must be socially distant, either using physical barriers such as plexiglass or physical distancing.  *Id.*  Inmates in quarantine or isolation cannot participate in visits.  *Id.*  Visitors must submit to symptom screening and a temperature check before entering a facility; those who are sick or symptomatic are denied entry.  *Id.*  Both the inmate and the visitor must wear facial coverings at all times and must perform hand hygiene before and after the visit.  *Id.*

Volunteer visits and tours have been suspended.  *Id.*  Contractors may access the BOP facilities to perform "essential services, religious worship services, or necessary maintenance on essential systems," but must complete a COVID-19 screening and temperature check before entry.  *Id.*

Additionally, the BOP has published extensive guidance to all staff and established a 24/7 hotline to answer staff questions about the virus.  *Correcting Myths and Misinformation About BOP and COVID-19*, at 2.

## III.    Conditions at the defendant's facility

The defendant is currently serving his sentence at Florence ADMAX, a supermax facility in Florence, Colorado.  *BOP Inmate Locator*, https://www.bop.gov/inmateloc/.  He has been incarcerated since 1974 in light of his D.C. convictions.

Florence ADMAX has a total of 357 inmates.  As of March 11, 2021, zero inmates and two staff members at the facility are positive for COVID-19.  *COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/.  Three inmates and 28 staff members previously tested positive for COVID-19 and have since recovered.  *Id.*  No inmate or staff member at the facility has died from COVID-19.  *Id.*

Florence ADMAX has implemented specific procedures in addition to the standard COVID-19 protocols required by the BOP.  As the defendant noted in his motion, the facility is

taking additional precautions, including daily temperature checks, weekly testing, and a lockdown instituted on or about November 23, 2020.  (ECF No. 179 at 7.)

Consistent with CDC guidance, the BOP has also begun administering vaccines to inmates and staff at the facility.  USP Florence received the first shipment of the COVID-19 vaccine during the week of January 18, 2021.  As of March 11, 2021, 110 inmates and 372 staff at the facility have received both doses of the COVID-19 vaccine.  *COVID-19 Vaccine Implementation*, BOP, https://www.bop.gov/coronavirus/.  The defendant received the first dose of the Moderna vaccine on January 22, 2021, and his second dose on February 24, 2021.  *See* Ex. 2.

### Argument

**I.    The Court Should Deny the Defendant's Motion Because He Has Not Established an Extraordinary and Compelling Reason for Compassionate Release**

Once defendants have satisfied administrative exhaustion, courts may reduce their sentences only upon a finding of "extraordinary and compelling reasons."    18 U.S.C. § 3582(c)(1)(A).[4]  Even though the defendant's age puts him at a higher risk of severe illness from COVID-19, the defendant has not established that this Court should exercise its discretion under § 3582(c)(1)(A)(i) to grant compassionate release because he has received the vaccine and he has not established a particularized risk of contracting COVID-19 at his facility.

Section 3582(c)(1)(A) authorizes a court to reduce a term of imprisonment when "extraordinary and compelling reasons warrant such a reduction."  Although the statute "does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release," the Sentencing Commission has "addressed the issue in a policy statement."  *United*

---

[4] As stated above, the defendant properly exhausted his administrative remedies by filing a request for compassionate release with the warden of USP Florence on November 18, 2020.  (ECF No. 179-2.)  The warden denied that request on December 3, 2020.  (ECF No. 179-3.)

*States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).   According to the policy statement, "extraordinary and compelling reasons" may exist based on the defendant's medical condition, age, family circumstances, or other reasons as determined by the BOP.   U.S.S.G. § 1B1.13.   If a district court finds that extraordinary and compelling reasons exist, the court may not reduce a sentence before "considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable."   § 3582(c)(1)(A).   The defendant bears the burden of proving that he is entitled to relief under § 3582(c)(1)(A).   *United States v. Weaver*, No. 1:17-cr-235, 2020 WL 4810123, at *2 (E.D. Va. Aug. 18, 2020); *see United States v. Morgan*, 473 F. Supp. 3d 544, 547 (D.S.C. 2020); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).

The Fourth Circuit's recent decision in *McCoy* does not reduce the defendant's burden of establishing an "extraordinary and compelling" reason for relief under § 3582(c)(1)(A).   In *McCoy*, the Court held that the policy statement in U.S.S.G. § 1B1.13 is not "applicable" to compassionate release motions brought by defendants under § 3582(c)(1)(A).   981 F.3d at 281-82.   Because § 1B1.13 "was adopted before the First Step Act" and specifically mentions only motions brought by the BOP, the Fourth Circuit reasoned that the policy statement does not apply to motions brought by defendants.   *Id.* at 282.   Absent an applicable policy statement, district courts should "make their own independent determinations of what constitutes an 'extraordinary and compelling reason[]' under § 3582(c)(1)(A), as consistent with the statutory language."   *Id.* at 284.

The Fourth Circuit noted, however, that § 1B1.13 "remains helpful guidance even when motions are filed by defendants."   *Id.* at 282 n.7 (citing *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) (observing that "[t]he substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'" and that "a judge who strikes off on a different path risks an appellate holding

that judicial discretion has been abused," such that the policy statement "can guide discretion without being conclusive")).  Accordingly, the Fourth Circuit has continued to reference § 1B1.13 as a guidepost for compassionate release motions even after *McCoy*.  *See, e.g.*, *United States v. Trotman*, No. 20-6217, 2020 WL 7392287, at *2 (4th Cir. Dec. 17, 2020) (per curiam); *United States v. Adamson*, 831 F. App'x 82, 83 (4th Cir. 2020) (per curiam).  Courts in this district have followed suit.  *See, e.g.*, *United States v. Nabaya*, No. 3:17-cr-3, 2021 WL 54361, at *6 (E.D. Va. Jan. 6, 2021); *United States v. Prater*, No. 3:13-cr-133, 2021 WL 54364, at *3 (E.D. Va. Jan. 6, 2021); *Perkins v. United States*, No. 2:18-cr-177, 2020 WL 7364222, at *2 (E.D. Va. Dec. 15, 2020); *United States v. Reid*, No. 2:02-cr-172-7, 2020 WL 7318266, at *2 (E.D. Va. Dec. 10, 2020).

After *McCoy*, defendants still must "meet the heightened standard of 'extraordinary and compelling' reasons [to] obtain relief" under the statute.  *McCoy*, 981 F.3d at 287; *see also Gunn*, 980 F.3d at 1180 ("The statute itself sets the standard: only 'extraordinary and compelling reasons' justify the release of a prisoner" under § 3582(c)(1)(A)(i)).  The Fourth Circuit's decision maintains that § 3582(c)(1)(A)(i) "set[s] an exceptionally high standard for relief" and that the "extraordinary and compelling reasons" standard is reserved for "the truly exceptional cases." *McCoy*, 981 F.3d at 287-88.

Courts have held that the COVID-19 pandemic, by itself, is not a sufficient basis for compassionate release.  *See, e.g.*, *United States v. Thompson*, No. 20-40381, 2021 WL 37493, at *3 (5th Cir. Jan. 5, 2021) ("Fear of COVID doesn't automatically entitle a prisoner to release."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release . . . ."); *United States v. Day*, 474 F. Supp. 3d 790, 805 (E.D. Va.

13

2020) ("[W]hile the global health crisis is no doubt extraordinary, it affects all prisoners; and the risk of being infected by COVID-19, standing alone, fails to justify an inmate's compassionate release."); *United States v. Feiling*, 453 F. Supp. 3d 832, 842 (E.D. Va. 2020) ("[T]he threat of COVID-19 exists both in- and outside of prison walls, and Defendant's fear of contracting COVID-19 cannot justify his release."). "Indeed, a general fear of contracting COVID-19, without a sufficient basis for that fear, does not provide an extraordinary and compelling reason for a defendant's release." *United States v. Chandler*, No. 3:15-mj-122, 2020 WL 6139945, at *5 (E.D. Va. Oct. 19, 2020); *see also United States v. Evans*, No. 3:00-cr-63, 2020 WL 5121331, at *5 (E.D. Va. Aug. 31, 2020) ("[A] 'fear' of contracting COVID-19[] . . . will not suffice as an 'extraordinary and compelling' reason for sentence reduction under 18 U.S.C. § 3582(c)(1)(A)."). Instead, "[i]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *Adamson*, 831 F. App'x at 83 (quoting *Feiling*, 453 F. Supp. 3d at 841); *see United States v. Blevins*, No. 20-7053, 2020 WL 7691726, at *1 (4th Cir. Dec. 28, 2020) (per curiam).

In this case, the defendant has not met the "heightened standard" of demonstrating an "extraordinary and compelling" reason for relief. Therefore, the Court should deny his motion for compassionate release.

### A.   The defendant has not demonstrated that he faces a particularized susceptibility to COVID-19

The defendant has not established an extraordinary and compelling reason for compassionate release because he has not shown that he faces a "particularized susceptibility" to COVID-19. *Adamson*, 831 F. App'x at 83. Although the defendant's age of 67 increases his risk for severe illness with COVID-19, he is fully vaccinated as of February 24, 2021. Moreover, his

14

medical conditions of an enlarged prostate, Hepatitis C, macular degeneration, myopia, presbyopia, glaucoma, anemia, and hematuria do not place him at increased risk based on current CDC guidelines, and there is no indication that the BOP is unable to help the defendant manage these conditions.

The CDC has recognized that the "[r]isk for severe illness with COVID-19 increases with age, with older adults [being] at highest risk." *Older Adults*, CDC (Feb. 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. In this case, the defendant may be at an increased risk for severe illness from COVID-19.

The defendant does not face a particularized susceptibility to COVID-19, however, because he is fully vaccinated as of February 24, 2021. *See* Ex. 2. The defendant received the first dose of the vaccine on January 22, 2021, and received the second dose on February 24, 2021. *See id.* The CDC represents that vaccination will protect individuals from getting sick with COVID-19, *Myths and Facts about COVID-19 Vaccines*, CDC (Feb. 3, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html, and may prevent individuals from "getting seriously ill" even if they do contract the virus, *Benefits of Getting a COVID-19 Vaccine*, CDC (Jan. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html. Because vaccination mitigates the risk of contracting COVID-19, the defendant cannot establish an "extraordinary and compelling" reason for compassionate release based on his concern about contracting the virus.

In addition to age, the defendant asserts that he suffers from Hepatitis C, macular degeneration, myopia, presbyopia, glaucoma, anemia, hematuria, an enlarged prostate, and moderate asthma, among other conditions. (ECF No. 183 at 7.) "To establish a particularized susceptibility to COVID-19, courts have required defendants to provide evidence that they suffer

from a medical condition identified by the [CDC] as a COVID-19 risk factor." *Chandler*, 2020 WL 6139945, at *5.

In its guidance concerning medical conditions that pose an increased risk due to COVID-19, the CDC distinguishes between individuals who "are at increased risk" and those who "might be at an increased risk" for severe illness from the virus. *See People with Certain Medical Conditions*, CDC (updated Feb. 22, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

At this time, the CDC does not consider individuals with any of the defendant's conditions, —namely, Hepatitis C, macular degeneration, myopia, presbyopia, glaucoma, anemia, hematuria, or an enlarged prostate—to be in either risk category. Generally, courts have found that defendants who suffer from medical conditions that the CDC does not recognize as posing a greater risk of severe illness from COVID-19 have not established "extraordinary and compelling reasons" for compassionate release. *See, e.g.*, *Prater*, 2021 WL 54364, at *6 (finding no particularized susceptibility based on prostate and bladder issues); *Wilson v. United States*, No. 2:11-cr-180, 2020 WL 3315995, at *3 (E.D. Va. June 18, 2020) (finding no particularized susceptibility based on Hepatitis B); *United States v. Moskop*, No. 11-cr-30077, 2020 WL 1862636, at *1 (S.D. Ill. Apr. 14, 2020) (72-year-old inmate "has suffered or suffers from various acute and chronic conditions including depression, high blood pressure, high cholesterol, an enlarged prostate, hearing loss, kidney disease, bleeding on the brain, and mental deterioration," but has served less than half of a 240-month sentence for serious fraud, and is at no particular enhanced risk from COVID-19).

Courts have denied motions for compassionate release in which the defendants relied in part on their Hepatitis C diagnosis. *See, e.g.*, *United States v. Johnson*, No. 17-cr-518-5, 2021 WL 308230, at *3 (E.D. Pa. Feb. 2, 2021) (denying compassionate release based in part on conclusion

16

that tuberculosis and Hepatitis C are not "high-risk conditions," high blood pressure "is only listed as one that 'might' increase one's risk of severe illness from COVID-19," and conditions appeared to be well-controlled); *United States v. Cox*, No. 08-cr-399, 2020 WL 3962171, at *4 (W.D. Wash. July 13, 2020) (62-year-old defendant suffers type II diabetes, hepatitis C, hyperlipidemia, hypertension, cognitive impairment, PTSD, and depression, and has five years remaining on 235-month sentence; relief is denied because robbery conviction followed two previous convictions for bank robbery); *United States v. Condon*, 458 F. Supp. 3d 1114, 1116 (D.N.D. 2020) (defendant has served about half of 180-month drug sentence; is 61 and suffers from asthma, COPD, cardiovascular disease, hepatitis C, hypertension, and hidradenitis suppurativa (an inflammatory skin disease that is frequently described as an auto-immune disorder), but there are no cases at the facility and no showing she would be safer in the community). *But see United States v. White*, 466 F. Supp. 3d 666, 671 (S.D.W. Va. 2020) (finding the defendant provided extraordinary and compelling reasons for release due to Hepatitis C when his facility was experiencing a "massive outbreak" of COVID-19 and the situation there had become "dire"). As to the defendant's enlarged prostate, the United States does not dispute that his medical records mention a potential diagnosis for cancer, but there is no indication that such a diagnosis is certain or imminent.

Importantly, the defendant's medical records demonstrate that the BOP is helping him manage his medical conditions, which weighs against finding extraordinary and compelling circumstances. *See, e.g.*, *United States v. Accardi*, No. 3:15-cr-113, 2020 WL 6059740, at *6 (M.D. Pa. Oct. 14, 2020) ("Accardi's voluminous medical records for his chronic care treatment indicate that he is being properly treated for [sleep apena, hypertension, and obesity] at LSCI Allenwood."). As defense counsel explains, there was an extended delay in treatment for the defendant's Hepatitis C, but now that the facility is treating his condition, there is no evidence of

17

deterioration of the defendant's conditions or unsuitability for treatment in prison, and the defendant appears able to function in that environment. *See, e.g.*, *Wilson*, 2020 WL 3315995, at *3 ("There is also no evidence that Petitioner suffers from an unmanageable liver disease, or that his Hepatitis B is not well controlled.  In fact, the record shows that medical personnel at FPC Montgomery are addressing Petitioner's medical condition.").  Chronic medical conditions that can be managed by the BOP do not amount to extraordinary and compelling circumstances. *See United States v. Ayon-Nunez*, No. 1:16-cr-00130, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12, 2020).

With respect to the defendant's asthma, as defense counsel provided, (ECF No. 183 at 7 n.16), the medical records do not indicate that he has asthma or that he is receiving treatment for it.  Even assuming that the defendant has asthma, the CDC lists moderate to severe asthma as a medical condition that "might" increase a patient's risk of severe illness from COVID-19. *See People with Certain Medical Conditions*.  At the outset, it is uncertain whether medical conditions in this second risk category can "support a finding of particularized susceptibility." *Weaver*, 2020 WL 4810123, at *2.  For this reason, "courts have found that certain conditions . . . do not constitute an extraordinary or compelling reason for compassionate release, absent some evidence of a diminution in the defendant's health." *Prater*, 2021 WL 54364, at *5.

Based on CDC guidance, courts have found that mild or intermittent asthma does not establish a particularized susceptibility to COVID-19. *See, e.g.*, *Chandler*, 2020 WL 6139945, at *5; *Weaver*, 2020 WL 4810123, at *2.  Further, asthma does not justify a finding of extraordinary and compelling circumstances if the defendant can manage his condition successfully in his current environment. *See, e.g.*, *United States v. Miller*, No. 3:16-cr-121, 2020 WL 4547809, at *5 (E.D. Va. Aug. 6, 2020) (finding no extraordinary and compelling circumstances where the defendant

had not "been hospitalized for, or suffered any other adverse effects from, his [chronic] asthma");

*Porter-Eley v. United States*, No. 4:16-cr-89, 2020 WL 3803030, at *3 (E.D. Va. July 6, 2020)

(finding no extraordinary and compelling circumstances where "[p]etitioner's asthma appear[ed]

well controlled and nothing in the record indicate[d] that the BOP [was] unable to manage" it).

In this case, the defendant has not established that his asthma is moderate to severe or that

it cannot be managed with the assistance of BOP officials. Indeed, the defendant's medical records

do not indicate that he has been treated for asthma in at least the last year. On this record, the

defendant's asthma does not constitute an "extraordinary or compelling" reason for relief under

§ 3582(c)(1)(A).

Accordingly, although the defendant's age can increase his risk for severe illness for

COVID-19, the defendant is fully vaccinated, and there is nothing to suggest that the BOP is ill-

equipped to treat his medical conditions. Accordingly, he cannot demonstrate that he faces a

"particularized susceptibility" COVID-19.

**B.     The defendant has not demonstrated that he faces a particularized risk of contracting COVID-19 at Florence ADMAX**

Even if the Court determines that the defendant's age or medical conditions make him

particularly susceptible to COVID-19, he has not established an "extraordinary and compelling"

reason for compassionate release because he has not shown any "particularized risk of contracting

the disease at his prison facility." *Adamson*, 831 F. App'x at 83; *see, e.g.*, *Evans*, 2020 WL

5121331, at *4-5 (finding that the defendant's underlying medical conditions were "extraordinary

and compelling" but that she did not face a particularized risk of contracting COVID-19 at her

facility).

Courts have required that a defendant's particularized risk "be supported by evidence of an

actual outbreak in his facility, not simply the mere possibility of COVID-19 spreading to his

19

camp." *United States v. Little*, No. 1:10-cr-135, 2020 WL 3442173, at *2 (E.D. Va. June 23, 2020); *see also United States v. Beahm*, No. 1:05-cr-249, 2020 WL 4514590, at *2 (E.D. Va. Aug. 5, 2020).

Florence ADMAX has a total of 357 inmates. As of March 11, 2021, there are zero inmates and two staff members who are positive for COVID-19. Three inmates and 28 staff members previously tested positive for COVID-19 and have since recovered. No inmate or staff member at the facility has died from COVID-19. 110 inmates and 372 staff have received both doses of the COVID-19 vaccine, including the defendant.

As referenced in defense counsel's motion, Florence ADMAX had 28 positive cases of COVID-19 among staff members as of January 14, 2021. (ECF No. 183 at 15.) These figures illustrate that the number of COVID-19 cases at Florence ADMAX "has steadily declined since Defendant filed his motion." *Day*, 474 F. Supp. 3d at 806. In other words, the "situation" at the facility "is improving, not deteriorating," and the defendant cannot "allege a 'particularized risk' of contracting COVID-19 at this time." *Id.*

Moreover, the defendant has not established any "inadequacies" relating to Florence ADMAX's "protocols," much less "how those inadequacies jeopardize his health." *United States v. Bryant*, No. 4:19-cr-47, 2020 WL 7497805, at *5 (E.D. Va. Dec. 21, 2020). Florence ADMAX continues to follow the BOP's modified operations plan during the COVID-19 emergency. In addition to the BOP's standard protocols, the defendant noted in his motion that the facility is taking additional precautions, including daily temperature checks, weekly testing, and a lockdown instituted on or about November 23, 2020. (ECF No. 179 at 7.) These mitigation efforts reinforce that the defendant does not face a particularized risk at his facility. *See, e.g.*, *Beahm*, 2020 WL 4514590, at *2 (noting BOP efforts to contain the spread of COVID-19, including "limiting access

to prisons, restricting prisoner movements within prisons, using screening and testing, educating inmates and staff on preventing the spread of disease, providing masks and hand cleaners, and separating ill inmates").

Further, the defendant's current incarceration does not present a particularized risk of contracting COVID-19 because his release plan does not show that he is less likely to contract COVID-19 outside Florence ADMAX.  If released, the defendant plans to live with a family member in Washington, D.C. or his daughter in Maryland.  (ECF No. 183 at 2, 22-23.)  As of March 11, 2021, Washington D.C. had 42,128 positive cases of COVID-19.  *See COVID-19 Surveillance*, https://coronavirus.dc.gov/data (last visited Mar. 11, 2021).  Maryland had 390,490 confirmed cases, and 788 people were currently hospitalized.  *See Maryland COVID-19 Data Dashboard*, https://coronavirus.maryland.gov/ (last visited Mar. 11, 2021).  Compared with the two active staff cases at Florence ADMAX, Washington, D.C. and Maryland do not present a lower risk to the defendant of contracting COVID-19.  *See United States v. Watson*, No. 1:07-cr-396, 2020 WL 7318269, at *2 (E.D. Va. Dec. 11, 2020) (finding that the defendant's release plan did not lower his risk of infection where "he would be living in a county with a significant number of positive COVID-19 cases"); *United States v. Lloyd*, No. 2:11-cr-36, 2020 WL 4501811, at *4 (E.D. Va. Aug. 5, 2020) (denying compassionate release where the "Defendant's proposed release plan involve[d] living with a family member just outside of Atlanta, Georgia, an area that has recently experienced a surge in COVID-19 cases"); *United States v. White*, No. 3:18-cr-61, 2020 WL 3442171, at *6 (E.D. Va. June 23, 2020) (finding it was "not clear" that the defendant "would be safer from the virus on home confinement" where "the number of cases in Richmond, Virginia—where Defendant would be released on home confinement—far exceed[ed] the number of cases in Petersburg, Virginia").

The United States does not have sufficient information to determine whether the defendant's release plan will sufficiently protect the public. Additionally, the defendant's medical records indicate that he has been receiving treatment for his medical conditions, including Hepatitis-C and enlarged prostate while at Florence ADMAX. The defendant has made no showing that he would continue receiving the requisite care if released.

Finally, even if his release plan would sufficiently protect the defendant and the public, as a practical matter, the defendant is currently subject to a detainer from this District because he is serving a life sentence from the D.C. Superior Court. Because of the detainer, "it is doubtful that he could be released in to the community." *United States v. Hernandez*, No. 13-cr-511, 2020 WL 3453839, at *7 n.4 (D. Haw. June 24, 2020); *see also United States v. Sellers*, No. 10-cr-434, 2020 WL 1972862, at *2 (D.N.J. Apr. 24, 2020) (motion for compassionate release denied because, if released, the defendant would only be transferred to a state institution to serve sentence on a murder conviction). And, it is not clear that the defendant would even be transferred to a different facility, given that he is serving his D.C. sentences at a federal facility.

Because the defendant has not established a particularized risk of contracting COVID-19 at his facility, he is not entitled to compassionate release under § 3582(c)(1)(A).

## II.    The Court Should Deny the Defendant's Motion Because the Statutory Sentencing Factors Do Not Support Release

Even if the Court determines that the defendant has demonstrated an extraordinary and compelling reason for compassionate release, it should deny the defendant's motion because the statutory sentencing factors weigh against release. Section 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before reducing a defendant's sentence. Those factors include "the nature and circumstances of the underlying offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to reflect the

22

seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the defendant." *Prater*, 2021 WL 54364, at *4 (citing 18 U.S.C. § 3553(a)(1)–(2)). Section 3553(a) also instructs courts to "consider the kinds of sentences available and the sentencing range established for the offense." *Nabaya*, 2021 WL 54361, at *4 (quoting 18 U.S.C. § 3553(a)(4)). Further, the Sentencing Commission policy statement, U.S.S.G. § 1B1.13, instructs courts to consider the factors set forth in 18 U.S.C. § 3142(g), including "the nature and circumstances of the offense charged . . .; the history and characteristics of the person . . .; [and] the nature and seriousness of the danger to any person or the community that would be posed by the person's release." U.S.S.G. § 1B1.13 (quoting 18 U.S.C. § 3142(g)). Additionally, "the Sentencing Commission has emphasized that a defendant's rehabilitation while incarcerated," by itself, is "insufficient to warrant a sentence reduction." *Prater*, 2021 WL 54364, at *4 (citing U.S.S.G. § 1B1.13, application note 3). In this case, the relevant statutory sentencing factors do not support compassionate release.

The seriousness of the defendant's offense weighs heavily against release. Courts in this district consistently have denied compassionate release based on the seriousness of the defendant's offense. *Reid*, 2020 WL 7318266, at *3 (finding that the statutory sentencing factors weighed against release where the defendant had "served as a 'manager' in a vast drug-trafficking conspiracy" and "continued his wrongful conduct even after his arrest by directing a co-conspirator to collect drug proceeds"); *see also Prater*, 2021 WL 54364, at *6 (finding that a defendant convicted of drug and firearm-related offenses had "proved his willingness to deal drugs on a large scale and to use violence in furtherance of that drug-dealing activity"); *Albury v. United States*, No. 2:19-cr-68, 2020 WL 6779643, at *5 (E.D. Va. Oct. 23, 2020) (finding that the statutory sentencing factors weighed against release where the defendant "was convicted of a large-scale

23

drug trafficking crime that he conducted over the course of five years," "possessed firearms," and "often travelled interstate to purchase and sell drugs").

Here, the defendant was characterized as a "kingpin" in a complex scheme to distribute narcotics in a jail. *See United States v. Gaffney*, No. 97-4826, 1999 WL 587886, at *1 (4th Cir. Aug. 5, 1999). He earned approximately $1,000 in illicit proceeds per day and distributed between 11.8 and 17.7 kilograms of heroin from his jail cell over the course of the enterprise. (PSR ¶¶ 11, 13.) As discussed above, he also paid conspirators in heroin who would then inflict violence on individuals whom the defendant considered a threat to his scheme or to steal from them. (PSR ¶¶ 20-31). That he committed these crimes while already serving time for other violent offenses speaks volumes about his disregard for the law and danger to society.

Indeed, the convictions for which the defendant is currently serving life sentences illustrate his violent criminal history. As stated above, in 1973, the defendant and Willie Engram were charged in D.C. Superior Court with assault with intent to rape while armed, assault with intent to kill while armed, two counts of armed robbery, two counts of rape while armed, kidnapping, carrying a pistol without a license, burglary I while armed, and armed burglary. (PSR ¶ 56.) On July 29, 1973, while in Victim-1's home, the defendant and Engram held Victim-1 at gunpoint, demanded narcotics, and then shot her in the chest. (*Id.*) The defendant and Engram also robbed the other victims in the home, and Engram raped Victim-2. (*Id.*) The defendant and Engram then kidnapped Victim-2 and rape her throughout the day. (*Id.*) They took Victim-2 to the home of Victim-4, and the defendant later robbed, raped, and threatened to kill Victim-4 over the course of eight hours. (*Id.*) On January 20, 1988, the defendant's sentence was modified to 10 years to life imprisonment on one of the armed robbery counts, 40 months to 10 years' imprisonment on the carrying a pistol without a license count, and 12 years to life imprisonment on the remaining

counts.  (*Id.*)

The defendant's extensive criminal history does not stop there.  As a juvenile, the defendant was charged with multiple crimes, as set forth in the PSR.  (PSR ¶¶ 46-54.)  As an adult, he was charged with receiving stolen property in 1972 and was sentenced to three to nine years' imprisonment.  (PSR ¶ 55.)  Specifically, he and a second individual forced themselves into the victim's home, forced an 11-year-old child into a closet, and stole a stereo, clock, and speakers.  (*Id.*)

Thereafter, on September 18, 1973, the defendant pulled a gun on a victim, stole the victim's watch, car keys, and money, and subsequently fled in the victim's car.  (PSR ¶ 57.)  For this crime, on December 12, 1976, the defendant was sentenced in D.C. Superior Court to two to eight years' imprisonment.  (*Id.*)

As these crimes demonstrate, compassionate release is not appropriate because the defendant presents a danger to the safety of others and the community.  *See* 18 U.S.C. § 3142(g). According to the BOP, the defendant is a High security inmate, with a PATTERN score of Medium risk recidivism level.  As stated above, the defendant committed the instant offense while already serving a life sentence for, among other crimes, rape.  *See, e.g.*, *United States v. Booth*, No. 3:15-cr-56, 2020 WL 6361935, at *4 (E.D. Va. Oct. 29, 2020) (finding that the defendant "present[ed] a danger both to himself and the community" because he had several prior larceny convictions at the time he committed the underlying offense); *Chandler*, 2020 WL 6139945, at *6 (finding that the § 3553(a) factors did not support release where the defendant had an "extensive criminal history, which started at age 15" and included "multiple theft-related offenses" and "several violent offenses").  Moreover, the defendant "has more than one offense involving firearms, which raises concerns about public safety should he be released."  *United States v. Harris*, No. 3:11-cr-156,

25

2020 WL 7646633, at *5 (E.D. Va. Dec. 23, 2020); *see also, e.g.*, *Lloyd*, 2020 WL 4501811, at *4 ("Defendant was also attributed with a firearm at sentencing, a fact that further underscore[d] the seriousness of his criminal conduct."). Accordingly, the statutory sentencing factors do not support the defendant's request for release.

The defendant asserts that he has made significant progress and rehabilitation during his current prison term. Specifically, he has taken approximately 53 educational courses while incarcerated, and the United States can confirm that he has not had an incident report since 2007. To be sure, his record and his rehabilitative efforts are commendable. However, "Congress made clear that '[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason'" for release. *United States v. Hill*, No. 3:14-cr-114, 2020 WL 6049912, at *5 (E.D. Va. Oct. 13, 2020) (quoting 28 U.S.C. § 994(t)). Consequently, the defendant's efforts at rehabilitation do not outweigh the seriousness of his crime and his extensive criminal history. *See, e.g.*, *Lloyd*, 2020 WL 4501811, at *4 n.7 ("While the Court commends Defendant for his documented efforts to work toward rehabilitation during his term of incarceration, his good behavior and pursuit of education in an institutional setting is insufficient to tip the scales in his favor based on the consideration of the record as a whole."); *Hill*, 2020 WL 6049912, at *5 ("While Hill's participation in an extensive number of educational and vocational programs [was] commendable," these measures did "not warrant his early release in light of the seriousness of his convictions and the time remaining on his sentence.").

Moreover, while his rehabilitative efforts are laudable, it appears that the defendant still refuses to accept responsibility for his actions. Indeed, as stated above, he claimed in his motion for compassionate release that he was indicted in this District "based on the purchased testimony of admitted drug addicts, and inmates testifying for plea bargains on their pending cases, and paid

26

inmates who were government informers who admitted under oath that they were paid to testify on other Lorton, prison cases." (ECF No. 179 at 2.)  Rather than admit wrongdoing, he has frequently attempted to relitigate his case.  As this Court explained: "Although defendant raises issues about the legitimacy of his conviction and sentence in his Motion for Compassionate Release, those matters have previously been fully settled and will not be further addressed by this Court." (ECF No. 182 at 1-2.)  Thus, while the number of classes the defendant has taken is impressive, he does not appear to show remorse for the crimes he committed in this District.

Finally, even if he were to be released, courts in this district have required the defendant to bear the burden of proving that his release plan will not pose a danger to the public. *See, e.g.*, *Miller*, 2020 WL 4547809, at \*6 (finding that the defendant had "not done enough to establish that he [would] not be a danger to society if released" based on his "criminal history, BOP records, and seeming inability to follow court orders, combined with the fact that his proposed release plan [did] not include any plan for ensuring that he [would] follow such orders and rules if granted release"); *Beahm*, 2020 WL 4514590, at \*3 ("As the party seeking relief and with no statutory guidance otherwise, Defendant bears the burden to prove that he is entitled to compassionate release.").  If released, the defendant proposes to live with a family member in Washington, D.C. or a daughter in Maryland.  (ECF No. 183 at 2, 22-23.)  Without more information about the residence, his family members, and his plan for obtaining medical attention, the defendant has not met his burden to show that this arrangement would keep him and the community safe.  And, it is not clear when the defendant would actually be released, in light of his D.C. convictions.

\*       \*       \*

The Court should deny the defendant's motion for compassionate release because he does not show a particularized susceptibility to COVID-19 in light of the fact that he received the

vaccine, there are few cases of COVID-19 at his facility, and in light of his criminal history and the statutory sentencing factors. In the alternative, if the Court determines that the defendant is entitled to compassionate release—and the defendant is actually released—the Court should require the defendant to complete a 14-day quarantine controlled by the BOP prior to his release.

## Conclusion

The Court should deny the defendant's motion for compassionate release.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

_____ /s/
Marie S. Zisa
Special Assistant United States Attorney
Bibeane Metsch
Assistant United States Attorney

28

**Certificate of Service**

I certify that on March 11, 2021, I electronically filed the foregoing response with the

Clerk of Court using the CM/ECF system, which will serve all counsel of record.

By: _____/s/_____
Marie S. Zisa
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: 703-299-3737
Facsimile: 703-299-3980
Email: Marie.Zisa2@usdoj.gov